1

COLBY B. SPRINGER (SBN 214868)
cspringer@polsinelli.com
POLSINELLI LLP
Three Embarcadero Center, Suite 2400
San Francisco, CA 94111
T:  415-248-2100
F:  415-248-2101

2

3

4

DANIEL D. OWEN (*PHV to be Submitted*)
dowen@polsinelli.com
POLSINELLI PC
900 W. 48TH Place, Ste. 900
Kansas City, MO 64112
T:  816-753-1000
F:  816-753-1536

5

6

7

8

9

Attorneys for Plaintiff
TEVRA BRANDS, LLC

10

11

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

12

13

TEVRA BRANDS, LLC,

14

Plaintiff,

15

v.

16

ELANCO ANIMAL HEALTH
INCORPORATED, ELANCO US, INC.

17

18

Defendants.

Case No. 24-4683

**COMPLAINT FOR ANTITRUST
VIOLATIONS OF THE SHERMAN ACT
AND THE CLAYTON ACT**

**DEMAND FOR JURY TRIAL**

19

20

21

22

23

24

25

26

27

28

Plaintiff Tevra Brands, LLC ("Tevra") brings this lawsuit against Defendants Elanco Animal Health Incorporated ("Elanco Animal Health"), and Elanco US, Inc. ("Elanco US") (collectively "Elanco" or "Defendants") for violations of the Sherman Act Section 1 for exclusive dealing, the Sherman Act Section 2 for monopoly maintenance and leveraging, and the Clayton Act Section 3 for exclusive dealing.  Elanco Animal Health and Elanco US are collectively referred to as "Elanco" unless context requires differentiating between the two companies. The relevant antitrust market includes all sales of Imidacloprid Topicals for dogs and cats in the United States.

## **NATURE OF ACTION**

1.      Tevra competes with Elanco by producing more effective generic alternatives to Elanco's Advantage and Advantix branded products.  Tevra offers its generic alternatives for sale at much lower prices than those of Elanco branded products.  Elanco's illegal monopoly maintenance, leveraging, and exclusive dealing substantially foreclosed and continues to substantially foreclose competition from Tevra and other generic manufacturers.  This illegal conduct has the effect of excluding Tevra from a substantial share of the relevant antitrust market, which in turn results in higher prices and fewer choices for buyers within the relevant antitrust market.

2.      Tevra was, and continues to be, damaged by a reduction in competition caused by Elanco's violations of the Sherman Act and the Clayton Act.  This includes Elanco's monopoly maintenance, illegal exclusive dealing, and illegal leveraging in the sale of "squeeze-on" Imidacloprid topical flea and tick treatments for dogs and cats ("Imidacloprid Topicals") that are purchased by retailers, distributors, veterinarians, and consumers throughout the United States. Elanco's name brands of Imidacloprid Topicals include Advantage and Advantix, which were previously sold under various brand names in the United States by Bayer HealthCare LLC ("Bayer").  Elanco began selling these Imidacloprid Topicals on August 1, 2020 following Elanco's acquisition of Bayer's animal health business.

3.      Tevra makes generic Imidacloprid Topicals that are lower priced and more effective than the name brand Advantage and Advantix flea and tick treatments sold by Elanco.

Despite Tevra's generic Imidacloprid Topicals being less expensive and more effective than Elanco's name brand Imidacloprid Topicals, many pet specialty retailers did not purchase Tevra's generic Imidacloprid Topicals.  This lack of carriage by pet specialty retailers resulted from Elanco's anti-competitive conduct.  Through this anti-competitive conduct, Elanco has maintained its monopoly in the market for Imidacloprid Topicals, substantially foreclosed generics (including those of Tevra) from the marketplace, and ensured that both retailers and consumers pay supra-competitive prices.

4.    Elanco made approximately 85% of all sales in the relevant market during 2020. Elanco (as a successor to Bayer's animal health business) received patent license royalties for up to the remaining 15% from CAP IM Supply, Inc.  To maintain its monopoly, and to prevent makers of generic flea and tick treatments like Tevra from competing against Elanco's Advantage and Advantix name brands, Elanco carried out illegal exclusive dealing and leveraging agreements.  Elanco forced retailers and distributors to agree not to carry generic Imidacloprid Topicals in competition with its name brand products like Advantix.

5.    Elanco has used its loyalty and exclusivity discounts to leverage other products to protect its sale of Imidacloprid Topicals from generic competition and, further, to maintain its monopoly in the relevant antitrust market.  Elanco's conduct, has caused and continues to cause, generic Imidacloprid Topical manufacturers, including Tevra, to be substantially foreclosed from entering the relevant antitrust market for Imidacloprid Topicals in competition with Elanco's name-brand products, including Advantage and Advantix.  The exclusion of generic Imidacloprid Topicals has resulted in substantially less competition, higher prices, and fewer product choices for retailers, distributors, and consumers.

**PARTIES**

6.    Plaintiff Tevra is a Nebraska limited liability company.  Tevra's headquarters is in Omaha, Nebraska.  Tevra was founded in 2015 by a group of six veterans of the pet products industry.  Prior to founding Tevra, these industry veterans acquired a tremendous depth and breadth of experience with flea and tick treatments.  This experience derived in part from having

worked at Sergeant's Pet Care Products, Perrigo, Bayer Animal Health, and other leading companies in the pet care industry.

7.      Defendant Elanco Animal Health Incorporated is a corporation organized under the laws of the State of Indiana, with its principal place of business at 2500 Innovation Way, Greenfield, Indiana 46140.  Elanco Animal Health Incorporated purchased Bayer HealthCare LLC's animal health division and since August of 2020 has been selling Bayer's former name brand Imidacloprid Topicals.

8.      Defendant Elanco US, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 2500 Innovation Way, Greenfield, Indiana 46140.  Elanco US, Inc. is a subsidiary of Elanco Animal Health Incorporated.

9.      Plaintiffs believe that Defendants Elanco Animal Health and Elanco US, Inc., either individually and/or in concert with one another, engaged in each of the complained of anti-competitive acts set forth herein.  Tevra does not believe that either defendant entity undertook any of said actions without the knowledge, ratification, and/or express or inherent authorization of the other.  Tevra alleges that when the acts of two or more entities concur in producing a single indivisible injury such entities are jointly and severally liable regardless of common duty, common design, or concerted action.  Tevra further alleges that the joint and several liability of the two codefendants entitles Tevra to seek recovery from either or both defendants.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), because this action arises under Section 3 of the Clayton Act, and Sections 1 and 2 of the Sherman Act.

11.      This Court has personal jurisdiction over each of the defendants pursuant to Title 15 of the United States Code because Elanco transacts business in the State of California.  This Court also has personal jurisdiction over each defendant because, inter alia, each defendant: (a) transacted business throughout the United States, including in California; (b) researched, developed, sold, shipped, and/or delivered substantial quantities of Imidacloprid Topicals

throughout the United States, including in California; (c) had substantial contacts with the United States, including in California; (d) engaged in anticompetitive agreements with companies in the United States, including those operating in California, and that were directed and had the direct, foreseeable, and intended effect of causing injury to the business or property of companies and consumers residing in, located in, or doing business throughout California and the United States; (e) engaged in the anticompetitive conduct described in below that had the direct, foreseeable, and intended effect of causing injury to the business or property of companies and consumers residing in, located in, or doing business throughout California and the United States; and otherwise (f) sold and/or directed their sale of name brand Imidacloprid Topical products to retailers throughout the United States, including in California.

12.     This Court also has personal jurisdiction over Elanco because Elanco intended and knew, or should have known, that their anticompetitive conduct and anticompetitive agreements outlined in this Complaint with nationwide pet specialty retailers would have the effect of preventing manufacturers of generic Imidacloprid Topicals from competing with Elanco and of increasing prices for both retailers and consumers.  Elanco knew, or should have known, that their anticompetitive agreements and anticompetitive conduct had an impact in California, and throughout the United States.

13.     Venue is proper in this District because each of the defendants transacts business in this District and may be found in this District, as defined by 15 U.S.C. § 22.

**FACTS COMMON TO ALL COUNTS**

**A.     The Relevant Antitrust Market**

14.     The relevant antitrust market for analyzing the illegal acts committed by Elanco is topical imidacloprid flea and tick products for dogs and cats in the United States.  This relevant antitrust market can be defined by application of the Hypothetical Monopolist Test as used by U.S. antitrust enforcement authorities, including the Department of Justice and the Federal Trade Commissions.

**1.     The Product Market**

15.     The relevant product market in this case is topical imidacloprid flea and tick products for dogs and cats in the United States.  The relevant antitrust product market does not include topical products containing other active ingredients such as Fipronil (for example, Frontline and its generic equivalents), or non-topical products like flea collars, oral medications, or shampoos.

a.      **Economic substitutes and cross-elasticity of demand**

16.     Different products may have similar intended purposes.  But whether those products are in the same or different relevant antitrust markets depends on: (a) their similarity of characteristics and (b) whether, as an economic matter, buyers actually switch between them based on price.

17.     Different products may be said to "compete" in the general sense because they have the same intended purpose.  But the colloquial use of the term "compete" does not mean that those products are in the same relevant antitrust market.  Nor does it preclude the possibility that one of the "competing" products has been monopolized.  It is common for pharmaceuticals and chemicals to be monopolized (often legally by patent protection), even though there are other products that have a similar intended purpose.

18.     All products have a chain of substitutes.  But not every product has "economic substitutes" that are relevant for antitrust analysis.  At one end of the chain of substitutes for a particular product are "strong" substitutes. They are similar, but not identical, in characteristics, and fewer buyers treat them as interchangeable. Ultimately, there may be very weak substitutes for a particular product, with significantly different characteristics and little or no interchangeability in the eyes of buyers.

19.     As a matter of economic theory, at competitive prices, buyers will only consider "strong" substitutes for a product they wish to purchase. At competitive prices, buyers would have no reason to consider "weak" substitutes for the product they desire.  Nor would buyers accept the inferior characteristics of weak substitutes.

-6-
COMPLAINT FOR ANTITRUST VIOLATIONS

20.     The economic concept of price elasticity provides a method of separating strong substitutes from weak substitutes for a given product.  Price elasticity measures the number of buyers that would switch from Product A to Product B, in response to a change in the price of Product A.  Strong substitutes for a given product have a "high elasticity of demand" with respect to that product.  Even a small price increase in Product A would cause buyers to switch to the strong substitute Product B.  Conversely, weak substitutes for a given product exhibit a "low elasticity of demand" with respect to that product.  A small increase in the price of Product A would not result in switching to the weak substitute, Product B, since buyers would want to avoid the inferior characteristics of that substitute.

21.     As a matter of economic theory, unrestrained competition by strong substitutes keeps prices at a competitive level. That is, if Product A and Product B are strong substitutes, competition from Product A helps maintain competitive prices for Product B, and vice versa.  If strong substitutes are unrestrained and competitively available, no opportunity to monopolize the market will arise.  If strong substitutes are not available (or otherwise constrained), a monopolist is able to increase prices above competitive levels, as buyers are forced into two inferior choices: (1) consider weaker and weaker substitutes, or (2) pay inflated prices.

### b.     Single-product markets for pharmaceuticals and chemicals

22.     Many pharmaceuticals and chemicals are sold in single product markets.  The price of those products are not constrained by other pharmaceuticals and chemicals that can be used for the same purpose.  But those products are weak substitutes.  This relates to the fact that new chemicals and pharmaceuticals are typically invented, patented, and sold as improvements over the existing pharmaceuticals and chemicals already available to buyers.

23.     Branded products and their generics typically have high cross elasticity of demand with one another.  Markets with generics typically include the original branded product and its generic equivalents.  Absent evidence of high cross-elasticity of demand with other products, the branded product and its generic equivalents are part of a single-product market that does not

include other products.  Single product markets for chemicals and pharmaceuticals are common and recognized by the courts.

### c.   Defining relevant antitrust markets using the Hypothetical Monopolist Test

24.   One widely-recognized economic tool for determining the limits of a relevant antitrust market (and identifying the products in that market) is the Hypothetical Monopolist Test ("HMT"). This test is commonly used by DOJ and FTC to determine whether certain products are, or are not, included in a relevant antitrust market.  A straightforward application of the HMT, using several data sources, shows that Fipronil topicals (including Frontline and its generics) and non-topical flea and tick treatments are NOT in the same relevant antitrust market as Imidacloprid Topicals (including Advantage, Advantix, and their generics).

25.   The HMT is used to determine whether a particular product is part of a relevant antitrust market by considering that product as a possible substitute and answering the following question: Could a hypothetical monopolist raise the price of Product A by a Small, but Significant Non-Transitory Increase in Price ("SSNIP"), without decreasing its profits because of price-induced switching to Product B?  If a SSNIP would be profitable to a hypothetical monopolist in Product A, then the possible substitute Product B is a weak substitute that should be excluded from the relevant antitrust market. Conversely, if switching to Product B renders a SSNIP unprofitable from the hypothetical monopolist producing Product A, then Product B is a strong substitute and should be included in the relevant antitrust market with Product A.

26.   The HMT is an iterative process that tests the cross-elasticity (substitutability) of one product after another.  This process continues until the outer limits of the relevant antitrust market have been defined.  If Product B is determined to be in the same relevant antitrust market as Product A (because it renders a SSNIP unprofitable for the hypothetical monopolist in Product A) then the next iteration of the HMT tests the next strongest substitute – Product C.  If switching to Product C renders a SSNIP unprofitable from the hypothetical monopolist producing Product A, then Product C is a strong substitute and should be included in the relevant antitrust market

96566307.1

with Product A.  The process continues until a weak substitute if found that does not render a SSNIP unprofitable for the hypothetical monopolist.  At that point, the weak substitute, and all other weaker substitutes, are excluded from the relevant antitrust market. Below is a graphic representation of this analysis:



**Diagram 1 – Hypothetical Monopolist Test and possible substitutes**

27.     To apply the HMT to decide which products are in the same antitrust relevant product market as Elanco's brand-name Imidacloprid Topicals, economists and antitrust enforcement agencies begin by identifying the product that is the closest substitute for Elanco's brand-name Imidacloprid Topicals. The *Horizontal Merger Guidelines* state that this product should be identified based on evidence of how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions.  Elanco has identified that product: it is generic Imidacloprid Topicals. Elanco knows this because when brand-name and generic Imidacloprid Topicals are sold in the same store, more customers switch from Elanco's brand-name Imidacloprid Topicals to generic Imidacloprid Topicals than to any other product.

28.     The agencies would then apply the HMT to a candidate market that includes only branded and generic Imidacloprid Topicals.  In that market, a hypothetical monopolist who

controlled both the branded and generic products could profitably raise price by a SSNIP. Elanco knows this because it profitably increased price when it controlled both the branded and the authorized generic Imidacloprid Topicals. That price increase was not rendered unprofitable by customers switching to any other product. Therefore, the HMT and the real-world data support the conclusion that no other product is in the antitrust relevant product market.

29.     The *Merger Guidelines* state that the agencies will choose the smallest relevant market satisfying the hypothetical monopolist test. Therefore, a market that satisfies the HMT is an antitrust relevant product market even if some weaker substitutes exist outside the market.

30.     Studies show that weaker substitutes, like Fipronil topicals such as Frontline and non-topical Imidacloprid products such as Seresto flea collars and Advantus soft chews, do not constrain Elanco's ability to raise the price of its Imidacloprid Topicals above the competitive level. This confirms that these products are not in the antitrust relevant product market under the HMT.

31.     Other flea and tick medications exist, such as sprays, shampoos, and drugs available only by prescription. Those products are weaker substitutes than any of the products discussed above. They are therefore excluded from the market by the HMT. Below is a graphic representation of the relevant antitrust market for Imidacloprid Topicals. Because the closest substitute, Fipronil topicals, did not constrain Elanco's repeated and significant price increases,

they are not included in the relevant antitrust market and neither are more distant substitutes such as oral, collars and shampoos:



**Diagram 2 – Application of the HMT to the Relevant Antitrust Market for Imidacloprid Topicals**

32.    To apply the HMT in the present case, one should begin with Elanco's Imidacloprid Topicals as Product A, and test whether Product B – Fipronil topicals renders a SSNIP unprofitable for Elanco. If a SSNIP is profitable for Elanco, then the limits of the relevant antitrust market have been found and Fipronil topicals should be excluded from the market definition.

**d.    Examination of the Elanco/Bayer acquisition by U.S. FTC**

33.    An investigation by the U.S. Federal Trade Commission suggests that the FTC does NOT consider Fipronil topicals and Imidacloprid Topicals to be interchangeable or in the same relevant antitrust market. In 2020, Bayer sold its animal health business to Elanco.  That transaction was reviewed and challenged as a violation of Section 7 of the Clayton Act by the antitrust regulators at the U.S. Federal Trade Commission. Further evidence that Imidacloprid Topicals and Fipronil topicals have a low cross-elasticity of demand and are not in the same

96566307.1

relevant antitrust market can be found in FTC's treatment of the Elanco/Bayer acquisition that was completed in 2020.

34.     In the FTC's investigation of the proposed acquisition, Bayer and Elanco were required to make detailed disclosures about the animal medications manufactured by each company, including Bayer's Imidacloprid Topicals (Advantage and Advantix) and Elanco's Fipronil topical (Parastar).  The FTC carefully examined each company's portfolio of animal medications.  The FTC looked for any "overlaps" of products which might result in Elanco having market power or a monopoly in a particular product after the acquisition was completed.  To identify and evaluate "overlaps" which might have anti-competitive effects, FTC typically uses the Hypothetical Monopolist Test, as described in its *Merger Guidelines*.

35.     During its review of the Elanco/Bayer acquisition, the FTC identified three overlapping products in which Elanco might obtain market power or monopoly after the acquisition was complete: (1) low-dose prescription treatments for canine otitis externa, (2) fast-acting oral treatments that kill adult fleas on canines, and (3) cattle pour-on insecticides.  The FTC narrowly defined the market for canine otitis externa treatments, rejecting "numerous" proposed substitutes, and placing particular emphasis on both the therapeutic action and the method of administration, as follows:

> Numerous prescription products treat canine otitis externa, but only the parties' products—Elanco's Osurnia and Bayer's Claro—require only one or two doses to treat the condition. ... other products require numerous applications to the ear canal, up to twice daily for 14 consecutive days, and are thus not reasonable substitutes for the parties' products, which are considerably more convenient to use.

Federal Trade Commission, Analysis of Agreement Containing Consent Orders to Aid Public Comment, *In the Matter of Elanco Animal Health, Inc., and Bayer Animal Health, GmbH*, File No. 1910198.

36.     The FTC also narrowly defined the market for fast-acting oral flea and tick treatments, again rejecting "numerous" proposed substitutes and again placing particular emphasis on both the therapeutic action and the method of administration, as follows:

COMPLAINT FOR ANTITRUST VIOLATIONS

96566307.1

> While there are numerous products that kill and prevent fleas on dogs, most are slower acting or preventative, targeting flea larvae. In contrast, Elanco's Capstar and Bayer's Advantus start killing adult fleas quickly (within 30 minutes for Capstar, and within 60 minutes for Advantus), and eliminate all adult fleas within four hours. Medicated shampoos and sprays that can be used to kill adult fleas are much less convenient to administer and are slower-acting.

*Id.*

37.     In each case where an overlap was identified, FTC required Bayer and/or Elanco to divest one or more products, to settle the FTC's antitrust challenge to the transaction.

38.     Significantly, FTC did not identify an overlap between Bayer's Imidacloprid Topicals and Elanco's Fipronil topicals.  The FTC did not order divestiture of either of these products. Imidacloprid Topicals have different active ingredients and significantly different therapeutic actions. This investigation and findings by the FTC is further evidence that Imidacloprid Topicals and Fipronil topicals are not in the same relevant antitrust market.

> **e.     Imidacloprid Topicals are distinct from and non-interchangeable with Fipronil topicals.**

39.     The active ingredients in flea and tick treatments are insecticides that kill and/or repel fleas and ticks. Some of these insecticides are common agricultural insecticides that are manufactured in enormous quantities and used worldwide. Two common insecticides used for flea and tick protection are Fipronil (which is the active ingredient in the topical treatment Frontline, and generics that compete with Frontline), and Imidacloprid (which is the active ingredient in Elanco's Advantix, and generics that compete with those products).

40.     Because common agricultural insecticides like Fipronil and Imidacloprid are widely available, inexpensive commodities, they usually constitute a small percentage of the cost of flea and tick treatments.  The major costs for most flea and tick treatments are instead the delivery systems for these active ingredients (such as a collar or a "squeeze-on" topical solution). There are also the very substantial costs of obtaining regulatory approval by the U.S. Environmental Protection Agency for the use of the formulation of active ingredients in each flea

96566307.1

and tick treatment.  There is still further the costs of marketing, selling, and delivering the products.

41.     Neither wholesale nor retail buyers of Imidacloprid Topicals and Fipronil topicals consider them to be interchangeable because they have distinct characteristics. In addition, wholesale buyers overwhelmingly purchase Imidacloprid Topicals for re-sale, not to use on their own pets.

42.     Imidacloprid Topicals and Fipronil topicals are not therapeutic equivalents, because Imidacloprid Topicals have therapeutic actions that Fipronil topicals lack. Specifically, Imidacloprid Topicals repel fleas, ticks, and mosquitoes, thereby preventing those insects from biting the pet. Fipronil topicals cannot repel fleas, ticks, or mosquitoes.  Those insects must instead bite the pet to receive a lethal dose of the insecticide.

43.     Flea and tick medications containing Fipronil are not in the relevant antitrust market.  Several sources of data show that Fipronil medications have a low cross-elasticity of demand with Imidacloprid Topicals.  They are therefore weak substitutes that did not constrain price increases of Imidacloprid topical products to monopoly levels. Specifically, Imidacloprid formulations sold today are more effective than Fipronil formulations.  They repel fleas and ticks, whereas Fipronil only kills them. In addition, unlike Fipronil, Imidacloprid kills and repels mosquitos and repels biting fleas. Thus, many consumers perceive the higher value of Imidacloprid topical formulations and do not consider them interchangeable with Fipronil topical formulations.

44.     In addition to having distinct formulations, distinct purposes, and distinct pricing, the industry recognizes the two types of products as separate from one another. Nielsen, a global data measurement and analytics company (including in the industry for pet products), separately tracks data for Fipronil and Imidacloprid.  Manufacturers and retailers therefore charge a small but significant and non-transitory increase in price for Imidacloprid formulations, as compared to Fipronil formulations.  Retailers and consumers do not switch from Imidacloprid to Fipronil

formulations in response to that price difference in numbers sufficient to make the price difference unprofitable.

45.     From a merchant's perspective, Imidacloprid Topicals and Fipronil topicals are complements, not substitutes. Merchants who purchase for resale do not substitute one for the other in response to price changes, because consumers expect retailers to carry both products. Consumers generally buy only one flea and tick treatment at a time, but retailers buy a full line of flea and tick treatments. Imidacloprid and Fipronil are not interchangeable to merchants who purchase for resale. To remain competitive and to offer the products that customers expect to find, retailers must carry both formulations.  Diagram 3, below, illustrates the different paths through the distribution chain by which Imidacloprid Topicals might reach pet owners. Distributors and retailers are not purchasing Imidacloprid Topicals to apply to their pets, but rather for re-sale. Therefore, distributors view many different flea and tick products as complements, rather than substitutes, so that they can offer choices to their customers.



**Diagram 3 – Distribution chains for Imidacloprid Topicals**

f.     **Topical flea and tick medications and delivery systems**

46.     Distinct, non-interchangeable, products deliver flea and tick treatment to pets in different ways, including flea collars, topicals, oral medications, sprays, wipes, and shampoos. Data and documents show that a small but significant non-transitory price increase in the price

of Imidacloprid Topicals did not lead consumers to switch from Imidacloprid Topicals to non-topical flea and tick products. These non-topical flea and tick treatments are therefore weak substitutes that are not part of the relevant antitrust market.

47.   "Topical" liquid treatments that are applied directly to a pet's skin or fur are distinct from flea collars.  Flea and tick treatments may also be given to pets orally. However, oral Imidacloprid products kill only adult fleas, and do not prevent re-infestation unless given every day.  Additionally, many consumers think of oral treatments as inconvenient and difficult to administer, because many pets will not consume the oral treatments, or will expel them. In some instances, consumers cannot administer such medications to their pets without using food or pill pouches to conceal the taste and smell of the medication. Even then, pets may reject them. The inconvenience of trying to administer oral products makes them a weak substitute for Imidacloprid Topicals.  Most importantly, oral Imidacloprid products are only available via prescription.

48.   Other products that contain flea and tick treatments include sprays, wipes, and shampoos. Those products account for a small percentage of total flea and tick treatment sales. Sprays, wipes, and shampoos are not part of the relevant antitrust market because they are generally not used for the prevention of fleas and ticks. Sprays, wipes, and shampoos are used for alleviating symptoms in animals that are already infested with fleas and/or ticks. These products can kill fleas and ticks on contact, but are generally aimed at relieving infested animals from itching and pain caused by fleas and ticks and washing away dead pests.

49.   The relevant antitrust market in this case does not include flea collars. Flea collars and topical flea and tick treatments are not interchangeable for most consumers. Some consumers prefer the convenience and ease of using a single flea collar for up to 8 months, but will not accept the frequency and difficulty of applying a topical treatment to their pet. Other consumers prefer the lower per-dose price of topicals and the control they have over when to apply them, but dislike the higher initial cost, smell, and appearance of flea collars. In addition, some consumers do not purchase flea collars due to safety concerns.

50.     Similarly, from the retailer's perspective, topical products are not substitutes for other delivery systems for flea and tick medications like oral treatments, flea collars, shampoos, and baths. Rather, these retailers must carry and sell each of these types of products to remain competitive. For retailers, these different categories of products are complements, not substitutes.

### 2.     The Geographic Market

51.     The geographic market for analyzing the antitrust violations committed by Elanco is the entire United States. Manufacturers of Imidacloprid Topicals sell those products to retailers with locations throughout the United States, and to distributors throughout the United States who sell the products to retailers, and those retailers subsequently sell the products to consumers in all fifty states. Because these products are based on pesticides regulated by the U.S. Environmental Protection Agency, they can only be imported or sold by companies that register them for particular uses. This regulatory constraint defines the limited geographic market as the United States.

### B.     Fipronil generics lowered prices of Fipronil flea and tick medications.

52.     In 1997, Merial (later purchased by Boehringer-Ingelheim) introduced its Frontline topical formulation of Fipronil to the U.S. market. Frontline has remained the single best-selling brand of Fipronil topical since that time.  Beginning in 2011, generic Fipronil topicals, which compete directly with Frontline, entered the U.S. marketplace. By 2018, generic Fipronil topicals accounted for approximately 52% of Fipronil topical sales, with Frontline still accounting for about 48%.  The results of generic Fipronil topicals entering the separate market for Fipronil topicals have been more competition against Frontline, lower prices, and more choices for retailers and consumers in that market.

53.     Upon information and belief, unlike Fipronil, despite the attempted entry of at least two generic Imidacloprid topical manufacturers in the past few years, at least 85% of the relevant market for Imidacloprid Topicals is controlled by Elanco. Elanco has a monopoly in the relevant market and effectively controls 100% of that market, because Elanco receives patent license royalties for much of the remaining 15% through CAP IM. Because of Elanco's anti-

COMPLAINT FOR ANTITRUST VIOLATIONS

96566307.1

competitive conduct, the relevant market has not benefitted from the entry of generics, as the Fipronil market did.

**C.    Elanco has substantially foreclosed Imidacloprid Topical generics from the relevant market.**

**1.    Imidacloprid products, including Advantix**

54.    Monopolies are not necessarily illegal.  They can be acquired legally.

55.    Bayer (prior to divesting its animal health business) appeared to have acquired its monopoly in Imidacloprid Topicals legally through the process of scientific research and invention.  Bayer sought and obtained a 10-year period of "exclusivity" by registering its Imidacloprid formulation with the U.S. Environmental Protection Agency. Bayer also sought and obtained legal protection for its monopoly by obtaining U.S. patents on its invention. Elanco acquired Bayer's animal health business and patents related to the Advantage and Advantix products.

56.    In 2016, the generic manufacturer CAP IM Supply, Inc. was granted conditional registration by EPA for its generic Imidacloprid topical.  CAP IM became the first manufacturer of generic Imidacloprid Topicals to attempt to enter the market for Imidacloprid Topicals. On information and belief, Bayer protected CAP IM's generic by way of a royalty bearing licensed agreement that Elanco carried on.

57.    Imidacloprid Topicals produced by CAP IM have been sold in the U.S. under various brand names including Advecta, PetLock and ParaDefense.  These sales do not represent unrestrained generic competition against Elanco, but rather are licensed products, also known as "authorized generics."  Elanco profits from these authorized generics through its receipt of royalties.  Elanco (consistent with its predecessor in interest) appears to have relegated CAP IM products to the less-lucrative "Food, Mass, and Drug" channel of grocery stores, discount stores, and drug stores.

58.    Elanco has illegally maintained its monopoly. Elanco has prevented the entry of true generic Imidacloprid Topicals by continuing contracts with retailers to punish those who

carried generic competitors to Elanco. Elanco rewards those who did not. Elanco leverages its monopoly in flea collars to protect its Imidacloprid Topicals from generic competition. The results of Elanco's illegal, anticompetitive, and exclusionary actions have been less competition, higher prices, and fewer choices for retailers and consumers.

### 2. Registration of insecticides with EPA and "exclusive use"

59. The insecticides used as active ingredients in flea and tick treatments are regulated by the U.S. Environmental Protection Agency, under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136a, *et seq*. This statute requires that manufacturers of insecticides register each formulation before offering it for sale in the U.S.

60. To obtain EPA registration under FIFRA for the use of an insecticide for a particular purpose, a company must submit detailed scientific data demonstrating the safety and effectiveness of that use of the insecticide formulation. If the EPA agrees to register the use of an insecticide for a particular purpose, the registering company has "exclusive use" of the data used to register that insecticide for that purpose, for a period of 10 years after registration, pursuant to FIFRA, 7 U.S.C. § 136a, *et seq*. The 10-year "exclusive use" period created by FIFRA registration effectively gives the registering company a monopoly over the use of the insecticide for the particular purpose.

61. The 10-year exclusive use period under FIFRA has expired for both Fipronil and Imidacloprid Topicals, allowing generic manufacturers such as Tevra to attempt to enter the market. Although the Advantage and Advantix Imidacloprid Topicals were at one time patented, Tevra's formulation is different and Tevra's Imidacloprid topical. Tevra did not and does not, therefore, infringe those or any other relevant patents Bayer/Elanco patents.

### D. Tevra's attempts to enter the market for Imidacloprid Topicals

62. In or about 2015, Tevra created detailed sales forecasts for both its generic Fipronil topicals and its generic Imidacloprid Topicals. Tevra recognized that it could sell several times more generic Imidacloprid Topicals than generic Fipronil topicals, due to several factors.

-19-

a. First, by 2016, the market for Imidacloprid Topicals was expanding, while the market for Fipronil topicals was shrinking.

b. Second, the Fipronil topical market was already crowded with generic competition. Velcera's "Pet Armor" generic Fipronil topical entered the market to compete with the name brand Frontline in 2011. Since that time at least four other manufacturers had entered the market for Fipronil topicals. This crowded market for Fipronil topicals made it difficult for another entrant, like Tevra, to obtain sales and market share.

c. Third, there were no generic Imidacloprid Topicals being sold. Tevra could therefore be the first generic entrant. Tevra's formulation was patented and did not infringe Bayer's then-patents, so Tevra had protection from other generics.

d. Fourth, generic Imidacloprid Topicals could be sold at higher prices than generic Fipronil topicals, because Elanco had acquired a monopoly with its Imidacloprid Topicals due to its patents and its prior "exclusive use" from its EPA registration. The price of the first generic is lower than the price of the monopoly branded product, but a high-priced branded product generally permits a higher price for the first generic.

e. Fifth, consumers are willing to pay more for Imidacloprid Topicals than for Fipronil topicals.

63. Tevra immediately went to work licensing a generic Fipronil topical to compete against Boehringer's name brand Frontline. Tevra also sought to register a generic Imidacloprid topical to compete against Bayer's, now Elanco's, name brand Advantix. Tevra applied for EPA registration of its generic Imidacloprid topical. The EPA granted the registration of Tevra's generic Imidacloprid topical in 2017.

64. Tevra's Imidacloprid Topicals are more effective than Elanco's Imidacloprid Topicals. Both topicals contain the same active ingredient. However, Tevra's method of delivering that active ingredient to the skin of the pet is superior to Elanco's.

96566307.1

65.     Controlled experiments have demonstrated that Tevra's Imidacloprid Topicals kill over 99% of fleas, just as Elanco's do, but Tevra's Imidacloprid Topicals also kill ticks more effectively than Elanco's. In addition, Tevra's Imidacloprid Topicals are less toxic than those produced by Elanco, due to their superior delivery method.

66.     Even before EPA registration was complete, Tevra hired a sales team of professionals with experience in the industry, and aggressively pursued sales to retailers. Beginning in 2016, Tevra's salespersons met with representatives of numerous retailers, including those identified below.

**1.     Tevra's successful entry into the separate Fipronil topical market**

67.     In 2017, Tevra made its first sales of its generic Fipronil topical. Because Tevra's product was a less expensive, equally effective alternative to Frontline, Tevra was able to demonstrate to retailers that carrying Tevra's generic Fipronil topical would increase sales and profits for the retailers.

68.     Attracted by the price and profitability advantages of Tevra's generic Fipronil topical, retailers began buying it in large quantities. Tevra made a profit of over $2.4 Million from online and pet specialty sales of its generic Fipronil topical in 2018.

**2.     Tevra was foreclosed from entering the Imidacloprid topical market**

69.     Tevra's attempts to sell its less expensive, more effective, generic Imidacloprid topical to pet specialty retailers have been substantially foreclosed by Elanco's illegal exclusive dealing, and leveraging schemes used to maintain its monopoly beginning in August of 2020, to the present day.

70.     Tevra attempted to sell its generic Imidacloprid topical to some of the same retailers that were already carrying Tevra's generic Fipronil topical. However, numerous pet specialty retailers refused to carry Tevra's generic Imidacloprid topical with certain of those retailers, or their distributors, explicitly identifying an agreement with Bayer, now continued by Elanco, as the reason for their refusal. These retailers have refused to carry generic Imidacloprid Topicals from Tevra, even though several of them sell generic Fipronil topicals. Elanco has

decidedly continued the agreements Bayer had in place before acquisition of Bayer's animal health division.

71.     In a competitive market, Tevra would be able to sell its products to retailers and distributors. Its generic Imidacloprid Topicals are more effective than Elanco's brand-name Imidacloprid Topicals. Tevra's generic Imidacloprid Topicals are also significantly less expensive than Elanco's brand-name Imidacloprid Topicals. Tevra has offered to sell retailers generic Imidacloprid Topicals for approximately 50% or less of Elanco's discounted wholesale price (as stated in Bayer written contracts that are now continued by Elanco upon information and belief) for K9 Advantix II Imidacloprid Topicals.  Despite the lower prices of Tevra's Imidacloprid Topicals, multiple major retailers and distributors have refused to purchase Tevra's Imidacloprid Topicals, and Tevra has been unable to sell any significant quantities of its Imidacloprid Topicals.  If a retailer purchased Tevra's generic Imidacloprid Topicals, the retailer could charge consumers prices that are significantly lower than the retail prices of Elanco's Imidacloprid Topicals.  From 2020 to 2024, Tevra sold almost none of its generic Imidacloprid topical in the pet specialty channel.

**E.      Elanco's Monopolization and Exclusive Dealing Foreclosed Entry into the Market for Imidacloprid Topicals**

72.     To maintain its monopoly in Imidacloprid Topicals, Elanco willfully and deliberately carried out various strategies to block generic entry and competition.  Elanco used an 'exclusivity' term in its contracts with retailers to create strong incentives not to carry generic Imidacloprid Topicals, and to punish retailers who did.  Elanco also leveraged its monopoly in imidacloprid flea collars to protect its monopoly in Imidacloprid Topicals.

73.     The acts described in the preceding paragraphs were done willfully and were purposely directed at the U.S. market.  These acts were undertaken with a specific intent to monopolize the relevant antitrust market for Imidacloprid Topicals and to substantially foreclose competition in that market.

**1.      Elanco's Purchase Agreements block generic entry**

74.     Elanco's Purchase Agreements include exclusivity discounts that cut the price of a large bundle of products, including its Seresto Flea Collar.  Those discounts are explicitly conditioned on the requirement that retailers refuse to carry generic Imidacloprid Topicals that compete with Elanco's higher-priced name brand topicals.  The discount does not apply to just Imidacloprid Topicals but an entire bundle of products, making it even more lucrative for retailers to keep out generic competition.

75.     Elanco's Purchase Agreements punish retailers that allow generic products to state that they "compare to" Elanco products in store displays, webpages and advertising. Elanco's Purchase Agreements reward retailers with higher discounts if, and only if, those retailers refused any "compare to" placement of competing generics.

76.     Not only do the Purchase Agreements require retailers and distributors to purchase Elanco's expensive Imidacloprid Topicals, but they also include a series of discounts that are aimed at preventing generic competitors from entering the market.  Elanco includes multiple loyalty discount provisions in contracts with retailers and distributors, some of which require exclusivity, exclusive advertising, and carrying Elanco's Imidacloprid Topicals. Other discounts prohibit "compare to" advertising, and making offers triggering a switch from Elanco's brands. Upon information and belief, some of these anti-competitive discounts were present in contracts originally executed by Bayer and carried on by Elanco followings its acquisition of Bayer's animal health division.

77.     Upon information and belief, these anti-competitive discounts and rebates amount to significant percentages for Imidacloprid Topicals, Seresto, shampoos, NSAIDs, dewormers, supplements, and eye care products.  For retailers making significant purchase commitments, these rebates are believed to generate well over tens of millions of dollars per year.

78.     Upon information and belief, the Purchase Agreements are not easily terminable by retailers or distributors. Elanco is a monopolist with at least 85% of sales in the relevant market—and effectively 100% since Elanco receives royalties for most of the remaining 15% of sales. A retailer who terminates or violates its Purchase Agreement with Elanco risks losing the

COMPLAINT FOR ANTITRUST VIOLATIONS

right to buy products that any pet specialty retailer must have to compete. That the Purchase Agreements are not easily terminable is further evident from the fact that no pet specialty retailer is believed to have ever terminated their Elanco contracts during the years that Tevra has been trying to sell its Imidacloprid Topicals in the pet specialty channel.  None of the six major pet specialty retailers ever agreed to purchase Tevra's Imidacloprid Topicals.

79.     The Purchase Agreements are also not easily terminable in part because retailers and distributors refuse to terminate those agreements in fear that they would lose the anticompetitive discounts and rebates on Elanco's products.  If a retailer were to not participate in Elanco's loyalty discount program, it could not compete with retailers who do participate in the discount program. This is the case in part because nearly every Purchase Agreement provided by Elanco makes clear that Elanco's customers understand that every other retailer and distributor gets the same base price on Elanco's products.  As discounts will be offered on an equivalent basis these agreements ensure that Elanco's customers—who themselves compete with one another—will be getting the same base pricing on Elanco's products, and that discounts will be equally offered to those competitors.

80.     As a result, these equivalent offering serve as a not-so-subtle threat and warning to each retailer that they will be at a severe cost disadvantage if they do not participate in the Elanco's anti-competitive scheme. Each retailer or distributor can see that its competitors will be getting a very substantial discount that it will not receive if it does not participate in Elanco's anti-competitive scheme. The discounts individually and collectively permit Elanco to enforce its exclusive dealing by substantially foreclosing manufacturers of generic Imidacloprid Topicals.  Elanco has utilized these illegal agreements to maintain its monopoly in the relevant market and to substantially foreclose generics from the relevant market.

81.     Regardless of the stated length of the Purchase Agreements or their termination clauses, the Purchase Agreements are not easily terminable and effectively operate as *de facto* long-term exclusive dealing agreements with the intent and effect to substantially foreclose generic manufacturers of Imidacloprid Topicals from the relevant market. Retailers cannot afford

to cancel the Purchase Agreements because Elanco has market power in the relevant market, and, if retailers were to terminate the Purchase Agreements, they would lose millions of dollars in discounts on various products.

82.     In addition, significant barriers to entry into the Imidacloprid topical market exist. These barriers to entry include references to now-expired patents on branded generic packaging and Elanco's anti-competitive conduct itself.  Acts such as these substantially foreclose generics from the market, as well as Elanco's monopoly of Imidacloprid Topicals. These and other barriers to entry substantially foreclose generics from the relevant market.   Thus, the Purchase Agreements are effectively sufficiently long term to foreclose competition, and are not easily terminable.

83.     Through the Purchase Agreements and other understandings and agreements with retailers and distributors, Elanco has foreclosed access to a substantial share of the relevant market by Tevra and other generic manufacturers of Imidacloprid Topicals.  The Purchase Agreements and related understandings amount to long-term exclusive dealing agreements between Elanco and the retailers and distributors. Due to the terms of the Purchase Agreements, Elanco's market power in Imidacloprid Topicals, and the threat that it would discontinue discounts on Elanco's Imidacloprid Topicals and other products, including the popular Seresto, retailers and distributors cannot do business with generic manufacturers of Imidacloprid Topicals. As a result of Elanco's ongoing anti-competitive conduct, there is no meaningful competition in the relevant antitrust market.

84.     Elanco's foreclosure of the market has been substantial.  This is in terms of both share of the relevant antitrust market that has been foreclosed and in the length of time it has been foreclosed. Upon information and belief, the restrictive purchase agreements have continued to be renewed by retailers who continue doing business with Elanco today and following its acquisition of Bayer's animal health division.  Elanco's market foreclosure is effectively infinite, as retailers have no choice but to renew these contracts for fear of losing Elanco's anti-competitive discounts and rebates.

85.     Imidacloprid Topicals are sold in several different sales channels in the U.S., including pet specialty retailers, internet retailers, general retailers, veterinarians, and direct-to-consumer sales.

86.     Tevra believes that it has been foreclosed from between 37% and 51% of all sales of Imidacloprid Topicals in the U.S., mostly in the two largest channels, brick and mortar pet specialty retailers and internet pet specialty retailers. However, the foreclosure in these largest channels spilled over into other channels, particularly direct-to-consumer sales, since Tevra was an "unknown" to these buyers, because it had no presence or visibility in the two largest channels, brick and mortar pet specialty retailers and internet pet specialty retailers. Tevra's foreclosure from distributors also kept it out of multiple channels that are served by those distributors.

87.     Tevra has direct evidence of foreclosure from the three large internet pet specialty retailers. Together, Chewy.com, Petco.com, and PetMed Express represent approximately 75% of Imidacloprid topical sales by internet pet specialty retailers. Elanco's agreements with these retailers have collectively foreclosed at least that share of the internet sales channel, as these retailers are unwilling or unable to purchase generic Imidacloprid products, even if the prices for such products are significantly lower than the prices for Elanco's Imidacloprid Topicals, for fear of losing Elanco's anti-competitive discounts and rebates.

88.     Tevra has direct evidence of foreclosure from three pet specialty retailers. Together, PetCo, PetSense, and PetSmart represent approximately 70% of Imidacloprid Topical sales by brick and mortar pet specialty retailers. Elanco's agreements with these retailers have collectively foreclosed at least that share of pet specialty sales channel, as these retailers are unwilling or unable to purchase generic Imidacloprid products, even if the prices for such products are significantly lower than the prices for Elanco's Imidacloprid Topicals, for fear of losing Elanco's anti-competitive discounts and rebates.

**F.     Elanco possesses monopoly power in the relevant market.**

89.     Elanco possesses monopoly power in the relevant antitrust market.  Elanco possessed monopoly power at all times relevant to this Complaint.  Direct evidence of Elanco's

-26-

monopoly power includes its demonstrated ability to control price and exclude competition in the relevant market. Because of its exclusionary conduct, Elanco can price Imidacloprid Topicals substantially higher than its generic competitors without losing customers. Elanco can and does exclude competitors like Tevra from the relevant market.

90.     Other direct evidence of Elanco's market power includes the lack of any meaningful competition in the relevant market. Tevra cannot meaningfully compete with Elanco in the relevant market. Retailers representing a substantial share of the market are not willing or able to purchase Tevra's generic Imidacloprid products, in fear that they will lose Elanco's anti-competitive discounts and financial incentives to exclude generics.

91.     There is also substantial indirect evidence that Elanco possesses monopoly power. Elanco possesses extremely high market shares in the relevant market of at least 85%. Elanco has received patent royalties from CAP IM for much of the other 15%.

**G.    Elanco maintained is monopoly in Imidacloprid Topicals by leveraging its monopoly in Imidacloprid collars.**

92.     Elanco used anticompetitive conduct and its monopoly power in the relevant product market for flea collars to maintain its monopoly power in the separate relevant product market of Imidacloprid Topicals. Elanco leveraged its dominant position in the relevant market for flea collars based on its patent-protected and blockbuster product, Seresto. Seresto is not threatened by generic competition. Elanco nevertheless protected its Imidacloprid Topical products, including brand name Advantage and Advantix, that were threatened with generic competition through use of the Setesto flea collar product.

93.     Elanco leveraged its monopoly power in the Seresto flea collar to protect the threatened products Advantage and Advantix by bundling a discount for all three products on a "take it or leave it" basis. Beginning on or about August 1, 2020, Elanco's retailer contracts offered a multi-percentage discount on the bundle of Advantage, Advantix, and Seresto. This discount was in exchange for making Elanco the exclusive seller of Imidacloprid products to the retailer. The retailer was not given the option of "unbundling" the discounts. If the retailer

wanted a discount on the patent-protected and blockbuster product Seresto, the retailer was required to make Bayer the exclusive supplier of other products. This included but was not necessarily limited to brand name Advantage and Advantix.

94. There is a relevant antitrust market for flea collars in the U.S., which are not close substitutes for other forms of flea and tick protection. For example, the Seresto flea collar offers eight months of flea and tick protection with a single application, which no other form of flea and tick protection can do. Neither oral medications, topicals, shampoos, sprays nor other forms of flea and tick protection offer eight months of protection with a single application and, therefore, have not restrained Bayer's price increases on the Seresto flea collar.

95. Elanco has monopoly power in the relevant antitrust market for flea collars. This is evidenced by its high dollar share of the market. This is reinforced by its patent for Seresto. That patent is still in force and has prevented the entry of generic competition.

96. The market for Imidacloprid Topicals is a separate relevant antitrust market. Imidacloprid Topicals did not restrain Elanco's price increases on the Seresto flea collar. Imidacloprid Topicals are not close substitutes for the Seresto flea collar. This is in part because of their different length of effectiveness, and the greater difficulty of applying them.

97. Elanco's strategy to leverage Seresto to protect its other product, Advantage and Advantix, worked and it has maintained its monopolies in both relevant antitrust markets.

**H.    Anticompetitive Effects of Elanco's Conduct.**

98. Elanco's anti-competitive conduct substantially lessened competition and maintained its monopoly in the relevant antitrust market for Imidacloprid Topicals. It also had the following anti-competitive effects:

a.    Tevra, and other sellers of generic Imidacloprid Topicals, were substantially foreclosed from the market for Imidacloprid Topicals.

b.    Retailers were prevented from purchasing lower-cost, equally-effective, generic Imidacloprid Topicals.

96566307.1

c.      Retailers were prevented from offering consumers a wider selection of Imidacloprid Topicals.

d.      Consumers were prevented from purchasing lower-cost, more effective, Imidacloprid Topicals, causing them to pay higher prices, and

e.      Consumers were denied choices of competing Imidacloprid Topicals.

**I.      Lack of Pro-Competitive Justification for Elanco's Actions**

99.     There are no pro-competitive justifications for Elanco's conduct.  Elanco's conduct served only to preserve Elanco's monopoly and resulting profits.  Elanco's conduct does nothing to advance market efficiency or consumer welfare. To the contrary, Elanco's anti-competitive conduct has damaged competition, raised prices, and diminished choices for retailers, distributors, and consumers.

**J.      Antitrust Injury**

100.    Tevra has suffered injuries of the type that U.S. antitrust laws were intended to prevent.  Those injuries flow directly and proximately from Elanco's illegal monopolization, exclusive dealing, and leveraging activities.  Elanco's conduct reduced competition.  Tevra was injured by the reduction in competition.  Elanco's illegal monopolization, leveraging, and exclusive dealing substantially foreclosed Tevra from entering the relevant antitrust market for Imidacloprid Topicals, thereby causing Tevra to lose prospective profits on the sale of its generic Imidacloprid topical.  Tevra was almost totally foreclosed from selling its products to pet specialty retailers and distributors, which represent approximately 37% to 51% of total selling opportunities for Imidacloprid Topicals.  .  Tevra has been substantially foreclosed from entering the relevant antitrust market indefinitely, since Elanco has been able to maintain written agreements with retailers.

101.    Elanco's illegal conduct disrupts competition in the relevant antitrust market. Because Elanco has foreclosed so much of the relevant antitrust market, even when Tevra offers significantly lower per-transaction prices, a substantial share of customers will not do business with Tevra. Because of Elanco's conduct, no competitor, including Tevra, can compete with

Elanco. Elanco is enabled, free from competitive discipline, to continue to demand higher prices from its customers for Imidacloprid Topicals. In turn, Elanco's anti-competitive conduct has resulted in the ultimate consumers being harmed by having to pay higher prices for Imidacloprid Topicals. Elanco's illegal conduct has succeeded in substantially foreclosing all meaningful competition from the relevant market and substantially lessened competition and tended to create and maintain a monopoly, by keeping generic Imidacloprid topical manufacturers from selling to a substantial share of the relevant antitrust market.

**K.     Tevra attempted to mitigate its damages, without success.**

102.     Tevra made numerous attempts to mitigate its damages by selling its generic Imidacloprid Topicals wherever, and to whomever, it could. Tevra sold small quantities of its products to small independent pet stores. Tevra sold to less lucrative general retailers wherever possible. Tevra has also sold its products directly to consumers. This includes sales through its own website and through Amazon. Unfortunately, direct-to-consumer sales can only reach a small subset of consumers that are willing to switch from brick and mortar pet specialty retailers like PetCo and major internet pet specialty retailers like Chewy.com.

103.     These direct-to-consumer sales also present significantly higher transactional costs, lower profit margins, and higher risks for Tevra and other manufacturers of generic Imidacloprid Topicals than do sales to retailers. Sales such as these are therefore not cost efficient for Tevra and other manufacturers of generic Imidacloprid Topicals. Moreover, direct-to-consumer sales are more difficult for products, like Tevra's Imidacloprid Topicals, that have been excluded from the largest pet specialty internet and brick and mortar pet specialty retailers, rendering them "unknowns" to consumers.

**L.     Tevra Has Been Damaged by Elanco's Anti-Competitive Conduct.**

104.     Tevra was damaged by Elanco's anti-competitive conduct that foreclosed Tevra from selling generic Imidacloprid Topicals to retailers, and caused it to lose the prospective profits. Tevra is entitled to treble damages. Tevra is further entitled to its attorney fees and the costs of this action.

-30-

96566307.1

## CLAIMS FOR RELIEF

### COUNT I
### UNLAWFUL MAINTENANCE OF A MONOPOLY, IN VIOLATION OF § 2 SHERMAN ACT, 15 U.S.C. §2

105.    Tevra incorporates all other allegations in this Complaint into Count I.

106.    Elanco has a monopoly on the sale of Imidacloprid Topicals in the U.S., and made approximately 85% of all sales in the relevant market since a time prior to 2020.

107.    At all relevant times, Elanco has had monopoly power in the United States in the sale of Imidacloprid Topicals.

108.    Upon information and belief, Elanco has willfully maintained its monopoly by means of its unlawful and anticompetitive exclusive dealing arrangements, extensive loyalty discounts aimed at preventing retailers and distributors from doing business with Elanco's competitors, other understandings or agreements with retailers and distributors.  Collectively, Elanco's conduct, agreements, contracts, and understandings substantially foreclose the relevant market.

109.    The effects of Elanco's monopoly have been to raise prices for both retailers and consumers, prevent the sale of lower cost, equally or more effective, competing products in the relevant market, to substantially foreclose competitors from access to the relevant market, to substantially lessen competition, and to create and maintain a monopoly in the relevant market.

110.    Tevra has been damaged by Elanco's maintenance of its monopoly by being substantially foreclosed from selling its products in the relevant market and by losing profits it would have made, but for Elanco's unlawful maintenance of its monopoly.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each Elanco defendant:

a.    A declaration that Elanco has violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

b.    Damages in an amount to be determined at trial, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15.

96566307.1

1  c.  The costs of this action, including reasonable attorney fees; and

2  d.  Such other relief as the Court finds just and equitable.

### COUNT II
### CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE, IN VIOLATION OF § 1 SHERMAN ACT, 15 U.S.C. §1
### Exclusive Dealing

111. Tevra incorporates all other allegations in this Complaint into Count II.

112. Elanco entered into contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

113. Elanco's illegal agreements included, but were not limited to, (a) exclusive dealing agreements with retailers and distributors that contain, among other things, a web of anticompetitive loyalty discounts, with the intent and effect of substantially foreclosing the relevant market and substantially foreclosing Tevra and other competitors from the relevant market; (b) agreements or understandings between Elanco and its customers through which Elanco's customers agreed not to purchase generic Imidacloprid products like Tevra's; and (c) other agreements and understandings with retailers and distributors that operated to substantially foreclose Tevra and other competitors from entering the relevant market.

114. Defendants' anti-competitive acts involved United States commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising prices for Imidacloprid Topicals and substantially foreclosing competitors from the relevant market in the United States.

115. As a direct and proximate result of Elanco's anti-competitive conduct, Tevra has been injured in its business or property by being substantially foreclosed from the relevant market.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each Elanco defendant:

  a.  A declaration that Elanco has violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.      Damages in an amount to be determined at trial, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15.

c.      The costs of this action, including reasonable attorney fees; and

d.      Such other relief as the Court finds just and equitable.

## COUNT III
## EXCLUSIVE DEALING IN VIOLATION OF § 3 CLAYTON ACT, 15 U.S.C. § 14

116.    Tevra incorporates all other allegations in this Complaint into Count III.

117.    Elanco has engaged in substantial U.S. interstate commerce by selling goods, including Imidacloprid Topicals, to distributors and retailers.

118.    Elanco's anti-competitive conduct described in this Complaint based the price of goods it sold, or discounts from, or rebates upon, such price, on the condition, agreement or understanding that the purchaser thereof shall not deal in the goods of a competitor, in violation of § 3 of the Clayton Act, 15 U.S.C. § 14.

119.    One effect of the condition, agreement or understanding described in the paragraph immediately above, above, is to substantially lessen competition in a line of commerce and tend to create and maintain a monopoly in the relevant market.

120.    Another effect of the condition, agreement or understanding, described above, was to foreclose Tevra from a substantial share of relevant market.

121.    Tevra has been damaged by the exclusive dealing scheme by being substantially foreclosed from selling its products in the relevant market, and by losing profits it would have made but for the exclusive dealing scheme.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each Elanco defendant:

a.      A declaration that Elanco has violated the Clayton Act § 3, 15 U.S.C. § 14;

b.      Damages in an amount to be determined at trial, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15.

c.      The costs of this action, including reasonable attorney fees; and

COMPLAINT FOR ANTITRUST VIOLATIONS

96566307.1

d.    Such other relief as the Court finds just and equitable.

<u>**COUNT IV**</u>
<u>**LEVERAGING TO MAINTAIN A MONOPOLY, IN VIOLATION OF THE SHERMAN ACT, § 1, 15 U.S.C. §1**</u>

1.    Tevra incorporates all other allegations in this Complaint into Count IV.

2.    Elanco had monopoly power in a relevant antitrust market for Imidacloprid Flea Collars because it was the patent holder and manufacturer of the Seresto flea collar, which did not face the threat of generic competition.

3.    Elanco also had monopoly power in a separate relevant antitrust market for Imidacloprid topicals, including it Advantage and Advantix products, which did face threats from generic competition.

4.    Elanco's anticompetitive conduct included leveraging its monopoly in Imidacloprid collars to protect and maintain its monopoly in Imidacloprid topicals.

5.    Elanco used its monopoly power in Imidacloprid Flea Collars to maintain its monopoly in Imidacloprid topicals, by bundling discounts on its Seresto flea collar and its Advantage and Advantix topicals, on the condition that retailers not carry generics to any of these products.

6.    Tevra was damaged in its business by Elanco's leveraging of the Seresto flea collar to protect the Advantage and Advantix products from competition with Tevra's generic Imidacloprid Topicals.

**WHEREFORE**, Plaintiff Tevra requests the following judgments and damage awards against each Elanco defendant:

a.    A declaration that Elanco has violated the Sherman Act § 2, 15 U.S.C. § 2;

b.    A permanent injunction against Elanco and its agents, restraining them from leveraging its Seresto product by bundling rebates on this product with other products that face generic competition.

c.    Damages in an amount to be determined at trial, for lost profits and lost value of the company, to be trebled pursuant to the Clayton Act § 4, 15 U.S.C. § 15.

COMPLAINT FOR ANTITRUST VIOLATIONS

96566307.1

1

d.      The costs of this action, including reasonable attorney fees; and

2

e.      Such other relief as the Court finds just and equitable.

3

4

5

**JURY DEMAND**

6

Tevra hereby demands a trial by jury on all issues so triable.

7

8

Dated:  August 1, 2024                                  Respectfully Submitted,

9

POLSINELLI LLP

10

*/s/ Colby B. Springer*

11

By:   COLBY B. SPRINGER
cspringer@polsinelli.com

12

POLSINELLI LLP
Three Embarcadero Center, Suite 2400

13

San Francisco, CA 94111
T:  415-248-2100

14

F:  415-248-2101

15

16

DANIEL D. OWEN
dowen@polsinelli.com

17

POLSINELLI PC
900 W. 48TH Place, Ste. 900

18

Kansas City, MO 64112
T:  816-753-1000
F:  816-753-1536

19

20

Attorney for Plaintiff
TEVRA BRANDS, LLC

21

22

23

24

25

26

27

28

-35-

96566307.1